## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| JOANN WUNDER *individually and* *on behalf of the heirs-at-law of* THOMAS WUNDER, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 13-4014-KGS |
| ELETTRIC 80, INC.; and ELETTRIC 80 S.P.A, | ) ) ) | |
| Defendants. | ) | |

### MEMORANDUM & ORDER

This matter comes before the court upon Defendant Elettric 80, Inc.'s Second Motion for Summary Judgment (ECF No. 109). Plaintiff Joann Wunder brings a wrongful death action against Elettric 80, Inc., asserting a negligence theory of liability. Ms. Wunder alleges that her husband, Thomas Wunder, died as a result of a workplace accident involving a laser guided vehicle ("LGV") maintained by Elettric 80, Inc. Ms. Wunder claims that Elettric 80, Inc. is liable for her husband's death because it breached its legal duty to provide a reasonably safe workplace by not addressing the LGV's failure to detect forklifts under certain circumstances; by not enforcing safety protocols; and by its failure to institute different or better employee training. Ms. Wunder claims that this breach led to Mr. Wunder's death.

Elettric 80, Inc. moves for summary judgment because it alleges that Ms. Wunder cannot establish that it owed Mr. Wunder a legal duty, and even if it did, the breach of any such duty was not the cause of Mr. Wunder's death. For the reasons stated below, Elettric 80, Inc.'s motion is granted.

### I.        Legal Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[1]  "A factual issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[2]  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue."[3]

"The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[4]  A movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; it need only point to a lack of evidence for the other party on an essential element of that party's claim.[5]

"Once the movant has met this initial burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial."[6]  "The nonmoving party may not simply rest upon its pleadings to satisfy its burden . . . [rather, it] must then set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier

---

[1] *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (citing *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002)).

[2] *Id.* (internal quotations omitted).

[3] *Id.*

[4] *Ascend Media Prof'l Servs., LLC v. Eaton Hall Corp.*, 531 F. Supp. 2d 1288, 1295 (D. Kan. 2008) (citing *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317. 322–23 (1986))).

[5] *Id.* (citing *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998))).

[6] *Ascend Media*, at 1295 (citing *Spaulding*, 279 F.3d at 904) (internal quotations omitted).

of fact could find for the nonmovant."[7]  This requires the non-movant to set forth facts

"identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated

therein."[8]  In addition, the nonmovant cannot rely "on ignorance of facts, on speculation, or on

suspicion, and may not escape summary judgment in the mere hope that something will turn up

at trial."[9]  "[S]ummary judgment is not a 'disfavored procedural shortcut;' rather, it is an

important procedure 'designed to secure the just, speedy and inexpensive determination of every

action.'"[10]

## II.      Uncontroverted Facts

The following facts were stipulated to by the parties in the final pretrial order or are

viewed in the light most favorable to Ms. Wunder, the non-moving party.[11]  On May 20, 2011,

Thomas Wunder was an employee of Del Monte Food Co. ("Del Monte") at its pet food

production and distribution center located in Topeka, Kansas.  Mr. Wunder was 63 years old and

had worked at Del Monte for over 30 years.  Del Monte used laser guided vehicles known as

LGV barges, for transporting pet food product.  The LGV barges in use at Del Monte were

assembled by Elettric 80, SpA according to its design specifications and sold to Del Monte

pursuant to a contract.  Elettric 80, Inc. did not manufacture, design, assemble, or sell the

forklifts or the LGV barges.  Pursuant to a contract, the LGV barges in use at Del Monte's

---

[7] *Id.* (citing *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671)) (internal quotations omitted).

[8] *Id.* (citing *Adams*, 233 F.3d at 1246).

[9] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1998) (citing *Bryant v. O'Connor*, 848 F.wd 1064, 1067 (10th Cir. 1988)).

[10] *Culp v. Sifers*, 550 F. Supp. 2d 1276, 1281 (D. Kan. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1)).

[11] Pretrial Order at 2–8, ECF No. 108.

production facility were installed and tested by Elettric 80 SpA and Elettric 80, Inc. in October

and November of 2008.  Elettric 80, Inc. provided initial training regarding the LGV barges to

Mr. Wunder, other Del Monte employees, and contract employees working at Del Monte.

Following installation and the completion of Del Monte employee training, Del Monte

confirmed the system was working properly and formally accepted the system and four LGV

barges.

Del Monte's maintenance department employees were responsible for maintenance on

the LGV barges.  Elettric 80, Inc. personnel would assist by answering any technical questions of

the Del Monte employees.  A maintenance agreement signed November 2, 2009 set forth Elettric

80, Inc.'s contractual maintenance obligations.  It provided that "The scope of this Agreement is

[to] provide support and day-to-day preventative for the equipment."[12]  Under the contract,

Elettric 80, Inc. agreed to provide an "embedded engineer" who would be on site at Del Monte

every weekday and provide:

1. Front line service coordination between Del Monte Topeka and E80 covering the overall operational performance of the equipment[.]
2. Time permitting, attendance of periodic on-site operational meetings with Del Monte Topeka's personnel.
3. Identification of continuous improvement opportunities for all equipment and practices relating to the Equipment.
4. Perform maintenance activities in line with production plans and available to maintenance windows.
5. Perform remedial maintenance activities time permitting.[13]

The agreement stated that "It is not the scope for the Embedded Engineer to oversee or otherwise

be responsible for the system performance of the Equipment, nor shall [he] undertake service and

operational activities which would normally be expected to be undertaken by Del Monte

---

[12] Second Mot. for Summ. J., ECF No. 109-7 Maintenance Agreement at 2.

[13] *Id.* at 4.

Topeka's own personnel."[14]  The agreement provided for preventative maintenance, consisting

of checking a list to ensure equipment components were inspected according to the equipment

manuals and documenting repair work.  Remedial maintenance required Del Monte to notify the

"Embedded Engineer of any corrective or remedial action that may be required to the

Equipment."[15]  Once Del Monte informed the embedded engineer that action was required, he

was required to respond and coordinate with Elettric 80, Inc. to fix the problem.[16]

The LGV barges had a maximum speed of roughly four to five miles per hour.  They

possessed push-button emergency stops, pressure-activated safety bumpers, and a pendant for

manual operation, all of which could be used to stop the barges.  They also possessed sensors

that created a laser detection field in the LGV barges' path of travel.  These sensors were

intended to detect safety cones within their detection field.  Safety cones were available to Del

Monte employees and employees were trained to place cones in front of barges when they

needed to be stopped.

Del Monte had two dedicated lanes for LGV barge operations between the production

department and the distribution center.  The northernmost lane was for LGV barges travelling

east to west.  The southernmost lane was for barges travelling west to east.  Del Monte used

manually operated forklifts, and had safety rules in place regarding the use of forklifts around

LGV barges.  These safety rules prohibited the use of manually operated forklifts in the lanes

dedicated for LGV barge operations.  The rules prohibited work or any other activity in the

dedicated LGV lanes, unless the LGV barges were stopped either by placing cones in their laser

---

[14] *Id.*

[15] *Id.* at 5.

[16] *Id.*

detection fields, or by using their stop functions.  Mr. Wunder was trained regarding the LGV

barges' safety systems, including their emergency stops, bumpers, manual operation pendant,

and laser detection sensors.  Ed Gallivan, on behalf of Elettric 80, Inc., trained Del Monte

employees, including Mr. Wunder, about the functions and safety aspects of working around

LGVs.

On May 20, 2011, Mr. Wunder was performing work duties at Del Monte's production

department in the ordinary course of his employment.  He was operating a forklift when he

learned that a pallet of pet treats had fallen off the conveyor belts into the eastbound LGV lane.

Mr. Wunder parked his forklift in the westbound LGV lane while he cleaned up the spilled pallet

in the eastbound lane.  He placed at least one safety cone in the eastbound lane, which stopped

the eastbound LGV barge.  Contrary to Del Monte safety policies, he did not place a safety cone

in the westbound lane or use any of the stop functions on the westbound LGV barge before

leaving his forklift in the westbound lane.  If Mr. Wunder had not parked his forklift in the

westbound LGV lane, or if he had placed a safety cone in the lane, or used one of the other stop

functions on the barge in the westbound lane, there would have been no chance of a collision.

While Mr. Wunder was cleaning up the spilled product in the eastbound lane, a coworker

informed him that the westbound barge was approaching the forklift that he left in the westbound

lane. No one was in the westbound lane at the time.  Upon learning that the westbound LGV

was approaching, Mr. Wunder stood up and attempted to stop the westbound LGV barge.  Mr.

Wunder fell and struck his head on the concrete floor when approaching the barge. Whether the

barge came into contact with Mr. Wunder is disputed, but none of the accident witnesses

personally observed the barge contact Mr. Wunder before or after he fell.  The parties disagree

about what occurred when Mr. Wunder fell, but as a result of his fall, he sustained a posterior

arch fracture in his C1 vertebrae and a fracture of the odontoid process of his C2 vertebrae.  Mr. Wunder died from his injuries.

### III.    Discussion

#### a.    Whether a duty exists is a question of law.

Elettric 80, Inc. asserts that Ms. Wunder cannot show that it owed a duty to Mr. Wunder and that absent such a duty her claim for negligence fails.[17]  "A plaintiff in a negligence action must prove four elements: a duty owed to the plaintiff, breach of that duty, causation between the breach of duty and the injury to the plaintiff, and damages suffered by the plaintiff."[18]  As the Kansas Supreme Court has observed,

> An accident which is not reasonably foreseeable by the exercise of reasonable care and prudence is not sufficient grounds for a negligence action. A fundamental rule is that actionable negligence must be based on a breach of duty. . . . Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact. Whether there is a causal connection between the breached duty and the injuries sustained is also a question of fact.[19]

It is the obligation of the trial court to determine whether a duty exists because without a duty, there can be no breach, and therefore no compensable negligence to support plaintiff's claim.[20]

Generally, "[t]he contours of a duty, especially one shaped by reasonableness, must be cast to the particular circumstances of the case.  But various considerations may inform that determination."[21]  For example, "An affirmative legal duty may be created by statute, a

---

[17] Second Mot. for Summ. J. at 18, ECF No. 109.

[18] *Shirley v. Glass*, 308 P.3d 1, 6 (Kan. 2013) (citing *P.W. v. Kansas Dept. of SRS*, 887 P.2d 430, 434 (Kan. 1994)).

[19] *Calwell v. Hassan*, 925 P.2d 422, 428 (Kan. 1996) (citing *Durflinger v. Artiles*, 673 P.2d 86, 91 (Kan. 1983)) (internal citations omitted).

[20] *Id.* at 434.

[21] *Estate of Belden v. Brown Cnty.*, 261 P.3d 943, 963–64  (Kan. App. 2011) (citing *Madison ex rel. Bryant v. Babcock Center, Inc.*, 638 S.E.2d 650, 659 (S.C. 2006) (noting, "That the factfinder may consider relevant standards of care from various sources in determining whether a defendant breached a duty owed to an injured person in a

contractual relationship, status, property interest, or some other special circumstance."[22] With these principles in mind, the court will examine whether Elettric 80, Inc. owed a legal duty to Del Monte employee Thomas Wunder.

### b.   Whether Elettric 80, Inc. owed a duty to provide a safe workplace.

Elettric 80, Inc. asserts that, "under Kansas law, Del Monte, as Mr. Wunder's employer, had a non-delegable legal duty to furnish Mr. Wunder with a reasonably safe workplace; a duty not shared by, or imposed on, Elettric 80, Inc."[23]  Ms. Wunder responds that Elettric 80, Inc. owed Mr. Wunder a legal duty based on the maintenance agreement between Del Monte and Elettric 80, Inc.[24]  She argues that the plain language of the agreement, deposition testimony, and "Elettric 80, Inc.'s role at Del Monte gave rise to a legal duty to . . . maintain safe working conditions for the LGV system."[25]

Generally, employers have an obligation to provide their employees with a reasonably safe work environment.[26]  Even if an employer contracts with a third party, the employer generally remains liable for that third party's acts.[27]  Mr. Wunder worked for Del Monte, not Elettric 80, Inc.  There is no evidence that Del Monte agreed to delegate or attempted to delegate

---

negligence case.  The standard of care in a given case may be established and defined by the common law, statutes, administrative regulations, industry standards, or a defendant's own policies and guidelines." *Madison ex rel. Bryant*, at 659.

[22] *Madison ex rel. Bryant*, at 656–57.

[23] Second Mot. for Summ. J. at 18, ECF No. 109.

[24] Resp. at 9, ECF No. 113.

[25] *Id.*

[26] *Smith v. Massey-Ferguson, Inc.*, 883 P.2d 1120, 1125 (Kan. 1994) (quoting *Fishburn v. Int'l Harvester Co.*, 138 P.2d 471, 472 (Kan. 1943)).

[27] *Id.* at 1128.

to Elettric 80, Inc. its responsibility to provide a safe work environment to its employees.

Instead, the maintenance agreement created a contractual duty, owed to Del Monte, requiring

Elettric 80, Inc. to perform maintenance work on the LGVs.

Under the agreement, Elettric 80, Inc. agreed to provide an embedded engineer to Del

Monte.  Dennis Mergenmeier held this position at the time of Mr. Wunder's accident.  The scope

of the maintenance agreement required the engineer to "provide support and day-to-day

preventative" maintenance.[28]  The agreement further provides that the embedded engineer should

primarily devote his full time to:

1. Front line service coordination between Del Monte Topeka and E80 covering the overall operational performance of the equipment[.]
2. Time permitting, attendance of periodic on-site operational meetings with Del Monte Topeka's personnel.
3. Identification of continuous improvement opportunities for all equipment and practices relating to the Equipment.
4. Perform maintenance activities in line with production plans and available to maintenance windows.
5. Perform remedial maintenance activities time permitting.[29]

Preventative maintenance was to include inspecting equipment according to the service manuals

and to make recommendations regarding maintenance "as needed, to improve and tailor the

[preventative maintenance] procedures to meet Del Monte Topeka's unique requirements."[30]

Remedial maintenance was to occur only if Del Monte notified Mr. Mergenmeier that corrective

or remedial action was necessary.[31]  The maintenance agreement states that "modernizations,

upgrades, new packaging introductions, special repairs, etc., shall be performed upon written

---

[28] Second Mot. for Summ. J., ECF No. 109-7 Maintenance Agreement at 1.

[29] *Id.* at 3.

[30] *Id.* at 4.

[31] *Id.*

request by Del Monte Topeka."[32]  Special repairs are further defined as "those actions requiring

an upgrade of the equipment."[33]  The maintenance agreement does not give Elettric 80, Inc. the

responsibility or even the authority to unilaterally undertake a modification of barge design.

There is no evidence that Elettric 80, Inc. failed to fulfill its contractual duty owed to Del Monte

and Ms. Wunder cites no evidence that Del Monte requested a design change or sensors to be

modified on the barges.

Ms. Wunder cites deposition testimony to support her theory that Elettric 80, Inc. owed

Mr. Wunder a legal duty to modify the allegedly defective barges.  However, the deposition

testimony is contrary to Ms. Wunder's position.  It further supports the position that Mr.

Mergenmeier, the embedded engineer, was responsible for fixing or troubleshooting the barges

and for performing routine maintenance, not for making modifications to the barges to correct an

alleged manufacturer's defect without Del Monte's request for such action.[34]  Moreover, no

testimony suggested that the barge was not working as it was designed to work on the day of the

accident.  Ms. Wunder's expert, Mr. Downey, explained that he was "not contending that

anything was malfunctioning on the equipment or not in proper working order."[35]  His testimony

establishes that he was not critical "of the maintenance, service, or repair of the barge that was

involved in the accident".[36]  He also recognized that "any change in the location of sensors, or in

---

[32] *Id.* at 7.

[33] *Id.*

[34] Gallivan Dep. 28:16–24, ECF No. 109-2 (explaining that Mr. Mergenmeier was "trained to troubleshoot if there was something not operational, operating correctly on the device and to switch components . . . He had preventative maintenance duties, and there was a checklist associated to that."  Gallivan Dep. 64:14–65:9, ECF No. 109-2.

[35] Downey Dep. 208:13–14, ECF No. 109-3.

[36] *Id.* at 207:8–208:21.

the orientation of sensors, would have to be with the permission of Del Monte."[37]  Nothing in the

deposition testimony suggests that Elettric 80, Inc. owed a legal duty to Mr. Wunder.  It only

reinforces the plain language of the maintenance agreement, which established a contractual duty

for Elettric 80, Inc. to provide general maintenance and upkeep on Del Monte's barges.

Ms. Wunder specifically relies on Mr. Mergenmeier's deposition for the proposition that

Elettric 80, Inc.'s contractual duties encompassed more than preventative maintenance.[38]

However, Mr. Mergenmeier's testimony establishes only that he was responsible for providing

maintenance on "LGVs in the distribution center . . . when requested, [he] was available to assist

with technical problems with barges."[39]  Others who worked at Del Monte provided similar

testimony.  Donnie Clausen testified that Mr. Mergenmeier was "the guy that is the programmer

and makes sure all of the LGVs and barges are working right."[40]  Michael Anaya, the head of Del

Monte's distribution center, stated at his deposition that "that's why the first three years of the

contract we went with Elettric 80[, Inc.] to maintain it, because it's not a vehicle we knew.  So I

couldn't tell you if he did a good job or bad job.  I thought he kept the vehicles running."[41]  Mr.

Anaya agreed that he thought Mr. Mergenmeier was essentially a mechanic.[42]

None of this deposition testimony suggests that Elettric 80, Inc. had a duty to do any

more than maintain the barges in working condition.  Even Mr. Downey, Ms. Wunder's own

---

[37] *Id.* at 208:18–21.

[38] Resp. at 9–10, ECF No. 113.

[39] Mergenmeier Dep.  17: 12–16, ECF No. 109-6.

[40] Clausen Dep. 8:5–7, ECF No 113-3.

[41] Anaya Dep. 56:6–10, ECF No. 113-11.

[42] *Id.* at 56:11–13.

expert, stated that it was his understanding that Del Monte was the entity that made decisions about whether to add sensors or change their location and "that Del Monte was . . . comfortable with their safety" procedures.[43]  Even if Ms. Wunder had established that Elettric 80, Inc. owed a contractual duty to Del Monte, she points to no evidence that Elettric 80, Inc. owed a legal duty to Mr. Wunder to make design changes to barges at Del Monte that were working as they were designed to work.  To the contrary, the maintenance agreement and testimony in the record suggests that such action would have exceeded Elettric 80, Inc.'s contractual duties.

### c.  Whether a duty can be created through OSHA's internal enforcement policies or expert testimony.

Elettric 80, Inc. asserts that Ms. Wunder cannot rely on internal enforcement policies of the Occupational Safety and Health Administration ("OSHA") or expert testimony to establish that it owed Del Monte employees a duty of care.  In the final pretrial order, Ms. Wunder contends that her "liability theory against Elettric 80, Inc., is predicated on its alleged status as a 'correcting employer' under OSHA and its alleged breach of OSHA's duty to provide a reasonably safe workplace by not addressing the alleged failure of LGV's to detect forklifts in certain circumstances."[44]  But in her response to Elettric 80, Inc.'s motion for summary judgment, she abandons this argument.

She states that "It is not Plaintiff's position [that] an OSHA regulation creates a duty by itself, but it does provide some guidance as to the standard of care expected by Defendants in maintaining the LGV system at the Del Monte plant."[45]  She explains that "expert testimony

---

[43] Downey Dep. at 209:9–213:9, ECF No. 109-3.

[44] Pretrial Order at 10, ECF No. 108.

[45] Resp. at 13, ECF No. 113.

assists in establishing Defendant's breached duty."[46]  It appears that Ms. Wunder seeks to use

expert testimony to address whether there was a breach, not to establish that Elettric 80, Inc.

owed a legal duty to Mr. Wunder.  The basis for Ms. Wunder's OSHA argument is that

plaintiff's expert Mr. Downey concluded that Elettric 80, Inc. did not properly train Mr. Wunder

and that Elettric 80, Inc. "violated an OSHA regulation by failing to exercise reasonable care in

preventing and discovering violations as a 'correcting employer.'"[47]

OSHA has a multi-employer citation policy that applies to worksites where "more than

one employer may be citable for a hazardous condition that violates an OSHA standard."[48]

However, Ms. Wunder has not explained how the policy applies to Elettric 80, Inc.  A correcting

employer must be "engaged in a common undertaking, on the same worksite, as the exposing

employer and [be] responsible for correcting a hazard.  This usually occurs where an employer is

given the responsibility of installing and/or maintaining particular safety/health equipment or

devices."[49]  The example provided in the policy involves a contractor hired to install safety

equipment—guardrails for fall protection.[50]  Elettric 80, Inc. was not hired to complete a similar

task.  As discussed above, Ms. Wunder has provided no evidence that Elettric 80, Inc. was hired

to make equipment safer, correct Del Monte employees when they failed to follow safety

procedures, or, as explained below, to provide them with remedial training when violations

---

[46] Resp. at 11, ECF No. 113.

[47] *Id.* at 11, 13.

[48] Second Mot. for Summ. J., ECF No. 109-16 OSHA Instruction on Multi-Employer citation policy at Sec. D. Correcting Employer.

[49] *Id.*

[50] *Id.* at Sec. D. 2. a. Example 5.

occurred.  Based upon the facts presented here, the court concludes that no legal duty was created upon Elettric 80, Inc. by OSHA's internal enforcement policies or by expert testimony.

Notably, following Mr. Wunder's accident, OSHA conducted an investigation at Del Monte and wrote a letter to Ms. Wunder informing her that it had "determined that no occupational hazards were associated with Mr. Wunder's death" and that it would not issue any citations to Del Monte.[51]  Ms. Wunder has cited nothing in the record that supports her position that OSHA violations occurred at Del Monte or that Elettric 80, Inc. would have been responsible for them if they had occurred.

Although at least one prior decision in this district has found that OSHA standards may be admitted in some cases as evidence to establish a standard of care, that decision also found that such evidence "cannot be considered conclusive proof of negligence or the absence of negligence."[52]  This conforms with Kansas case law on the subject that explains that "Neither industry standards nor entity-specific practices are generally treated as conclusive in establishing a 'reasonable' duty."[53]  Instead, such evidence is appropriate "in determining whether a defendant breached a duty owed to an injured person."[54]  Only once a court finds the existence of such a duty should the "precise extent and nature of that duty, which is grounded in relevant standards of care . . . be determined by a jury."[55]

---

[51] Second Mot. for Summ. J., ECF No. 109-13 OSHA Letter.

[52] *Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1229 (D. Kan. 2002) (quoting *Martin v. Mapco*, 866 F. Supp. at 1308).

[53] *Estate of Belden v. Brown Cnty.*, 261 P.3d 943, 964 (Kan App. 2011).

[54] *Madison ex rel. Bryant v. Babcock Center, Inc.*, 638 S.E.2d 650, 659 (S.C. 2006).

[55] *Id.*

### d. Whether Elettric 80, Inc. owed a duty to provide remedial training to Del Monte employees.

Elettric 80, Inc. asserts that it did not owe a duty to provide remedial training to Del Monte employees when they failed to follow established safety procedures.[56] Ms. Wunder responds that "Elettric 80, Inc.'s role at Del Monte gave rise to a legal duty to enforce safety protocols . . . Defendant became aware Del Monte employees did not follow proper safety protocols . . . [and that ] Defendant was negligent in failing to institute different or better training processes."[57] The parties agree that Elettric 80, Inc. and Del Monte were responsible for the initial training Del Monte employees received in 2008.[58] Mr. Gallivan was the Elettric 80, Inc. employee who was responsible for providing initial training about the functions and safety aspects of working around LGV barges. However, Del Monte decided who would receive training and what type of training they would receive.[59] Ms. Wunder offers no evidence to controvert this fact.

Ms. Wunder suggests that when Elettric 80, Inc. became aware that Del Monte employees were not following safety procedures, it should have taken action to improve training and enforce safety procedures.[60] Ms. Wunder offers no evidence that suggests that such a duty existed or that Elettric 80, Inc. had any authority to correct Del Monte employees. To the contrary, Ms. Wunder's own expert, Mr. Downey, stated at his deposition that Del Monte had an

---

[56] Second Mot. for Summ. J. at 27, ECF No. 109.

[57] Resp. at 9, ECF No 113.

[58] Second Mot. for Summ. J. at 6, ECF No. 109.

[59] Second Mot. for Summ. J. at 6, ECF No. 109 (Elettric 80, Inc.'s Statement of Uncontroverted Material Facts of Record ¶ 29 state "various levels of training were provided . . . and Del Monte determined the level of training each employee received."); Resp. at 4, ECF No. 113 (Ms. Wunder admits ¶ 29); Gallivan Dep. at 29:6–32:1, ECF No. 109-2.

[60] Resp. at 10, ECF No. 113.

obligation to train and supervise its employees to work safely around barges.[61]  He agreed that

Elettric 80, Inc. did not have the authority "to change any of [Del Monte's] workplace safety

without Del Monte's . . . authorization.[62]  Specifically, Mr. Downey agreed that he "did not offer

any opinion in [his] report where [he was] critical of the training of either Mr. Mergenmeier or

Mr. Wunder."[63]  Mr. Gallivan, the Elettric 80, Inc. employee responsible for providing initial

training, stated that when he saw the safety procedures violated he "complained to Del Monte

management."[64]  This suggests that he did not have the authority to correct Del Monte employee

behavior, and Ms. Wunder cites nothing to controvert this assessment.

In support of Ms. Wunder's position that Elettric 80, Inc. had a duty to provide additional

training or to correct Del Monte employees, she offers primarily argument by counsel.  Ms.

Wunder emphasizes that Elettric 80, Inc. employees Mr. Gallivan and Mr. Mergenmeier

"became aware the safety training provided had been inadequate, that Del Monte employees

were not following safety protocols, and made no attempt to improve training and enforce safe

working conditions around the LGV equipment."[65]  What Ms. Wunder fails to establish with this

argument, is that Elettric 80, Inc. had a legal duty to do so.

To support her assertion that Mr. Downey concluded that Elettric 80, Inc. did not

properly train Mr. Wunder, Ms. Wunder cites to a portion of his deposition transcript that reads:

> Q. Do you agree that Del Monte had the obligation to train and supervise its
> workers to work safely around barges?

---

[61] Downey Dep. 256:16–18, ECF No. 113-9.

[62] Downey Dep. 241:12–19, ECF No. 115-3.

[63] Downey Dep. 213:6–9, ECF No. 109-3.

[64] Gallivan Dep. 68:10–20, ECF No. 109-2.

[65]  Resp. at 10, ECF No. 113 (citing Mergenmeier Dep. 41:20–47:24, ECF No. 113-4).

A. Yes.

Q. Do you think that Del Monte failed to properly train Mr. Wunder to safely work around barge traffic?

A. I would say, based on the evidence with the manner in which it is believed that he tried to stop the barge, I'd say, yes.[66]

These conclusions do not even mention Elettric 80, Inc.  If anything, this testimony argues that Del Monte, not Elettric 80, Inc., had a duty to properly train Mr. Wunder.  Mr. Downey also asserts that throwing a hat down to "flag" the eye of a laser is not an appropriate way to safely stop a barge.[67]  Other than this statement, Ms. Wunder cites nothing in the record for her claim that Elettric 80, Inc. failed to properly train her husband.

There is testimony in the record that Del Monte employees did not always abide by the established safety procedures.[68]  The parties agree that Mr. Wunder violated at least one established safety procedure at the time of his accident.[69]  He was trained to use the safety systems but chose to park his forklift in an LGV barge lane without using any of the numerous emergency functions to stop the westbound barge.[70]  Ms. Wunder has failed to establish that Elettric 80, Inc. had any duty or authority to correct Del Monte employees when they acted contrary to established safety procedures.  To the extent that Ms. Wunder's response can be

---

[66] Resp. at12, ECF No. 113 (citing Downey Dep. 256: 16–23, ECF No. 113-9).

[67] Resp. at 13, ECF No. 113 (citing Downey Report at 3, ECF No. 113-5).

[68] *See, e.g.*, Gallivan Dep. 68:10–20, ECF No. 109-2 (Mr. Gallivan reported complaining to Del Monte when its employees failed to follow safety procedures).

[69] Pretrial Order at 4–7, ECF No. 108.

[70] *Id.*

interpreted as an attempt to establish a duty based on Mr. Downey's testimony, the testimony instead suggests that if any entity owed a duty to Mr. Wunder it was Del Monte.

There is no evidence that Elettric 80, Inc. had an ongoing duty to monitor Del Monte employees, enforce Del Monte's safety procedures, or to provide additional training when those procedures were not followed.   The only testimony offered establishes that Del Monte had exclusive control over who was trained, what level of training they received, and what modifications, if any, should be made to the equipment at its facilities.

### IV.    Conclusion

The court concludes that no legal duty was owed by Elettric 80, Inc. to Mr. Wunder upon which liability could be based.  Because plaintiff has not established that a duty existed, the court need not consider defendant's arguments regarding the other elements of the negligence claim. The absence of a legal duty precludes any recovery on a claim of negligence.  Therefore, the court finds that Elettric 80, Inc. is entitled to summary judgment.

Accordingly,

**IT IS THEREFORE ORDERED** that Defendant Elettric 80, Inc.'s Second Motion for Summary Judgment (ECF No. 109) is granted.

**IT IS SO ORDERED.**

Dated this 30th day of September, 2015, at Topeka, Kansas.


s/ K. Gary Sebelius_____
K. Gary Sebelius
U.S. Magistrate Judge